R. Hunter Bitner II                      July 12, 2007
Assurance Co. of America vs. MDF Framing

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


ASSURANCE COMPANY OF          )
AMERICA, an Illinois          )
Corporation,                  )
                              )
          Plaintiff,          )
                              )    No.
     v.                       )    3:06-CV-169-MO
                              )
MDF FRAMING, INC., an         )
Oregon Corporation,           )
                              )
          Defendant,          )
                              )
     and                      )
                              )
ORENCO EAST VILLAGE, LLC;     )
SIMPSON HOUSING LIMITED       )
PARTNERSHIP, LLLP, n/k/a      )
SHLP HOLDINGS, LLLP;          )
PALOMA, LLC; and GREAT WEST   )
CONTRACTORS, LLC,             )
                              )
          Intervenors.        )



          DEPOSITION OF R. HUNTER BITNER II

            Taken in behalf of Plaintiff

                 July 12, 2007


Exhibit 36
Page 1 of 5

Moore Henderson & Thomas, Inc. (503) 226-3313
moorehenderson.com

c32f89b2-daf3-4ac4-ab57-420c0e781254

R. Hunter Bitner II                          July 12, 2007
Assurance Co. of America vs. MDF Framing

1     Q.  Would you agree with me that this third-party

2  complaint that we have as Exhibit 2 alleges that

3  there was a contract entered between MDF Framing,

4  Inc., and Great West to do framing and other work?

5     A.  Yes.

6     Q.  And that the claims alleged in the third-party

7  complaint are based on that alleged contract --

8     A.  Yes.

9     Q.  -- as well as common-law claims arising from

10  those obligations.

11     A.  Right.  The tort claims.

12     Q.  Before the filing of the original third-party

13  complaint, were you aware that there was an entity

14  called MDF Construction, Inc.?

15     A.  I can't tell you when I became aware of that.

16     Q.  At some point you became aware that there was

17  another entity that was called MDF Construction,

18  Inc.?

19     A.  Yes.

20     Q.  Is it also your recollection that in the

21  project files there are bids submitted and checks

22  that were issued to MDF Construction, Inc.?

23     A.  Again, I know I became aware of it.  Yes.

24     Q.  You just don't recall how --

25     A.  Right.

Exhibit 36
Page 2 of 5

Moore Henderson & Thomas, Inc. (503) 226-3313
moorehenderson.com

c32f89b2-daf3-4ac4-ab57-420c0e781254

R. Hunter Bitner II                              July 12, 2007
Assurance Co. of America vs. MDF Framing

1    complaint was the last third-party complaint that was

2    filed in the case and the one that was operative at

3    the time the default judgment was taken against MDF

4    Framing, Inc.?  Do you know the answer to that?

5         A.  I don't know, unless I see a signed filed copy,

6    I just can't answer that.

7              I'll tell you, there are some oddities within

8    the complaint itself that makes me think this might

9    be a draft.

10        Q.  What oddities are those?

11        A.  Look at Page 13.  I like to think that wouldn't

12   slip by me before something got filed.

13        Q.  You mean the line by 67?

14        A.  Correct.

15        Q.  I thought you just had a unique style.

16        A.  Greg, you know me all too well.

17             No, in all honesty, I don't have a recollection

18   one way or the other.

19        Q.  Looking at this document and comparing it with

20   the first third-party complaint that's Exhibit 2, it

21   doesn't appear that there are substantive changes in

22   the allegations against MDF Framing, Inc.

23        A.  I doubt there are, actually.  If there's a big

24   change, it's probably in the parties.

25        Q.  Okay.  My question is, over the course of time,

Exhibit 36
Page 3 of 5
c32f89b2-daf3-4ac4-ab57-420c0e781254

R. Hunter Bitner II                          July 12, 2007
Assurance Co. of America vs. MDF Framing

1    were there substantive changes to the claims against
2    MDF Framing, Inc., in amended complaints, or were
3    those amendments done for other purposes?
4        A.  If memory serves, they were most likely done
5    for other purposes.  The only thing that changed
6    during the process of the litigation is what MDF did
7    on the project, but I don't think that required any
8    amendment.
9        Q.  Okay.  Meaning what work areas they were
10   responsible for in the construction process?
11       A.  Right.
12       Q.  But there were never changes in the legal
13   theories that were advanced against MDF Framing,
14   Inc.?
15       A.  I don't believe so.  We may have added a claim
16   at some point after the first -- the original
17   complaint -- third-party complaint for perhaps
18   additional insured purposes or something of the sort,
19   but that was across the board.  It wasn't specific as
20   to MDF.
21       Q.  And do you recall what that allegation was?
22       A.  Either -- that's why -- and I may be crossing
23   cases here -- I'm hoping I'm not -- that the contract
24   required the parties to add us as an additional
25   insured under a policy, and they owe us insurance, or

Exhibit 36
Page 4 of 5
c32f89b2-daf3-4ac4-ab57-420c0e781254

R. Hunter Bitner II                          July 12, 2007
Assurance Co. of America vs. MDF Framing

Page 37

1    they failed to do so, and, therefore, breached the

2    contract.

3        Q.   Okay.   To your recollection, were there any

4    other substantive amendments to the claims against

5    MDF Framing, Inc.?

6        A.   I don't believe so.

7        Q.   At any point, can you recall giving

8    consideration to amending the complaint to allege

9    that MDF Framing, Inc., somehow owed an obligation to

10   your clients because it was a successor in interest

11   to the entity MDF Construction, Inc.?

12       A.   Not that I remember.

13       Q.   Did your office ever serve a notice of

14   deposition on Otto Foster, Sr., or any other employee

15   of MDF Framing, Inc.?

16       A.   I don't believe so.

17            (To Mr. Pelandini)  I thought you were jumping

18   in.

19            MR. BAIRD:  That was your usual intake of

20   breath before an objection, Bill.

21            MR. PELANDINI:  That's the signal.

22            THE WITNESS:  Just do a sign at some

23   point.  Let me know.                    Exhibit 36

24   BY MR. BAIRD:                           Page 5 of 5

25       Q.   Did you ever hire an investigator in an attempt

c32f89b2-daf3-4ac4-ab57-420c0e781254

IN THE CIRCUIT COURT OF THE STATE OF OREGON

IN AND FOR WASHINGTON COUNTY

ASSOCIATION OF UNIT OWNERS,       )

      Plaintiffs,       )

v.                               )    No.: C050290CV

ORENCO EAST VILLAGE, LLC          )

      Defendants.       )

EXCERPT OF EXAMINATION OF BRIAN HUBBS

Held before

THE HONORABLE JUDGE THOMAS KOHL

June 13, 2006

DATE TRANSCRIBED:    August 2, 2007

TRANSCRIBED BY:      Bonnie Reed, CET

                   Court-Certified Transcriptionist

                   Notary Public

Exhibit 37
Page 1 of 24

Testimony of Brian Hubbs                          June 13, 2006

Page 2

1

2          .-

3                          A P P E A R A N C E S

4

5

6     On Behalf of Defendants:

7     MARTHA HODGKINSON

8     Hoffman, Hart & Wagner LLP

9     1000 SW Broadway 20th Floor

10    Portland, Oregon 97205

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                   Exhibit 37
25                                   Page 2 of 24

Testimony of Brian Hubbs                              June 13, 2006

Page 3

1                        June 13, 2006

2                          .-o0o-

3

4           MS. HODGKINSON:  The next witness that we have

5    is Brian Hubbs from RDH who will essentially, Your

6    Honor, establish the damage, the breaches, the basis for

7    indemnification and the dollar amounts that we're

8    seeking today.

9           THE CLERK:  Under penalty of perjury, do you

10   solemnly swear or affirm that the testimony you're about

11   to give in this case shall be the truth, the whole truth

12   and nothing but the truth so help you God?

13          THE WITNESS:  I do.

14          THE CLERK:  Have a seat.  For the record would

15   you state your name and spell your last name.

16          THE WITNESS:  My name is Brian Hubbs,

17   H-u-b-b-s.

18

19   MR. BRIAN HUBBS,        Having first been duly sworn

20                           the witness testified as follows:

21

22        D I R E C T   E X A M I N A T I O N    Exhibit __37__

23   BY MS. HODGKINSON:   .                       Page _3_ of _24_

24      Q.   Mr. Hubbs, good afternoon.  This isn't a jury

25   trial, so I'm not going to pull out your whole resume in

Testimony of Brian Hubbs                              June 13, 2006

Page 4

1    front of the Court, because I don't think we need to do

2    that.  But I would like you to tell the Court some basic

3    essential information about your background, your

4    training, your education, and what you do for a living

5    if you wouldn't mind, please.

6        A.    I graduated in 1991 from University of

7    Waterloo, civil engineering.  I proceeded to work for a

8    company that I had worked for on one of my summer jobs

9    called Morrison Hershfield, Limited.  And they are a

10   forensic consulting firm that deals specifically in

11   building envelope issues.  I worked for them for seven

12   years, traveled across Canada, ended up on the West

13   Coast through a number of other offices and started an

14   office in Vancouver, became a principal of Morrison

15   Hershfield.

16            And then about eight years ago left with three

17   other -- two other colleagues of mine and started a

18   small firm called RDH Building Sciences.  In the last

19   eight years, we've grown to 50 people.  We have offices

20   in Vancouver and Victoria, Canada; and we have offices

21   in Portland and in Seattle in the U.S.

22            And we -- our primary focus is building

23   envelope work.  We deal in building forensics,

24   litigation support, this kind of work.  And we do work

25   for contractors and developers when they build new

Exhibit 37
Page 4 of 24

Testimony of Brian Hubbs                              June 13, 2006

Page 5

1    buildings to try to help avoid ever getting in this

2    situation.

3        Q.   Just can you give the Court a little bit of an

4    idea of building envelope, describe what that means, the

5    whole...

6        A.   We basically look at building enclosures.  And

7    we look at it, more often than not, dealing with water

8    ingress problems.  However, we do have structural

9    engineers and architects on staff that deal with

10   structural issues and cracking issues and slab

11   deflection issues and that sort of thing.  But our

12   primary focus is on air, water and condensation

13   resistance in building enclosures:  Roofs, walls,

14   windows, curtain walls, that type of thing.

15       Q.   Can you give us an idea of some of the

16   professional societies of which you're a member and any

17   awards or presentations you have?

18       A.   I belong to the Professional Engineering

19   Association in British Columbia.  So I'm a professional

20   engineer, but in British Columbia, Canada.  I'm not

21   licensed in Oregon or Washington.  I belong to the

22   (inaudible) Contractor's Association, and the British

23   Columbia Building Envelope Association.

24            I sit on a number of standards committees:

25   Window Installation Standard Committee in Canada, and

Page 7

1    Locally, I've worked on a number of mediation

2    cases such as McKenzie (inaudible) which are very

3    similar to this case.

4    Q.    You testified in arbitration?

5    A.    I did, yeah.

6    Q.    And in short, you've had a significant amount

7    of experience in evaluating and diagnosing building

8    envelope problems, correct?

9    A.    Basically it's been 15 years of solid

10   experience.  I really haven't done anything else.

11   Q.    All right.  And were you asked by the

12   defendants, the Simpson and Great West Entities in this

13   matter, to conduct an investigation of the Club 1201

14   project out in Orenco?

15   A.    Yes, I was.

16   Q.    All right.  And were you asked to -- what were

17   you asked to do, basically, when you were first hired?

18   A.    Initially, we were asked to come in and take a

19   look at the buildings and try and give everybody a sense

20   of whether or not what the plaintiffs were saying was

21   what was really out there.  I think there was a real --

22   in this case, there was a real want to understand what

23   was going on there, not to necessarily shirk

24   responsibility, but to truly understand what was going

25   on and --

Exhibit 37
Page 6 of 24

Testimony of Brian Hubbs                      June 13, 2006

Page 8

1    Q.    Because it wasn't evident from just looking at

2    the buildings, was it?

3    A.    No.  I mean, we sort of had a gut feel at the

4    time.  But in discussing it with everybody, I think

5    everybody really wanted to move ahead and find out what

6    was really wrong with it.  They didn't want to just rely

7    on the other reports in terms of, you know, what they

8    were saying was wrong; primarily roof.

9    Q.    And you -- in doing this investigation, you

10   actually physically tested the building on several

11   occasions, correct?

12   A.    Yes, we did.

13   Q.    Three times, in fact, I think.

14   A.    Yeah.  We were out there on three different

15   occasions for different investigations, exterior once

16   and interior another time.

17   Q.    And you did perform what we call destructive

18   testing on these buildings which is cutting open and

19   seeing what's behind the exterior, correct?

20   A.    That's correct.

21   Q.    Both inside and outside?

22   A.    Yeah.

23   Q.    All right.  And in addition to doing building

24   investigation, were you provided with copies of reports

25   from the plaintiffs' experts?

Exhibit 37
Page 7 of 24

83ac471e-78ee-42c4-971c-005057fe62dc

Page 11

1    This presentation is basically broken out into

2    five sections.  The basics of cladding design, just so

3    we all understand what -- how cladding is supposed to

4    work -- the as-built conditions, what the construction

5    documents say, how they relate to code and industry

6    standards and then the summary.

7    From a wall standpoint, walls have to resist

8    air leakage and rain leakage and precipitation.  And a

9    barrier of face-sealed wall gets wet from rain and when

10   wind blows against it, it pushes that rain through the

11   wall.  And if there's a hole, it comes right in.

12   On a rainscreen or a drain-screen type wall,

13   like we have primarily at Orenco, there's a space or a

14   cavity behind the cladding, which allows the water to

15   drain down and get out.  So the exterior surface sheds

16   most of the water, and then anything that gets behind

17   that is stopped from getting inside by --

18   THE COURT:  The cladding is the exterior of the

19   wood or whatever?

20   THE WITNESS:  That's right.

21   Q.   So here's just a section.  And what I'm going

22   to talk about in the report are two different surfaces,

23   the water-shedding surface and the water resistive

24   barrier.  And this is real key because MDF was

25   responsible for putting on the WRB and not the WSS, not

Exhibit 37
Page 8 of 24

83ac471e-78ee-42c4-971c-005057fe62dc

Testimony of Brian Hubbs                          June 13, 2006

Page 12

1    the water-shedding surface.

2          So in any given wall assembly, like we have at

3    Orenco, we've got a water-shedding surface, and that's

4    supposed to deflect or drain the majority of the water;

5    and that will be the siding or the brick or the windows

6    or the flashing or caulking, those all make up the water

7    shedding surface.

8          The water-resistive barrier or the WRB is

9    something that's hidden behind.  It's the building paper

10    or the Tyvek.  And that's supposed to stop the water to

11    ever touching something that's moisture sensitive.  And

12    that's supposed to be installed in a way that sheds

13    water and that's fairly water resistant.  So the

14    building paper and in some cases on this building a

15    product called Amowrap, which is a green product, you'll

16    see.  So the WRB must be shingle lapped and continuous

17    to perform this function of a secondary line of defense.

18          The way these wall assemblies need to work is

19    most of the water has to be stopped on that outside

20    surface, you can't have both water draining down in

21    between or it just overloads the paper's ability to shed

22    water.  They're really intended to kick in when you have

23    a bad rain storm or a significant event but not to be

24    wetted every day, all day.

25          So when you talk about that, it's all a

Exhibit 37
Page 9 of 24

Testimony of Brian Hubbs                                    June 13, 2006

Page 13

1    balance.  You have to allow to dry long enough so that

2    it can dry out before you wet it again or else it stays

3    wet.  So it's just like, you know -- it's a balance, you

4    have to keep it dry; but when it does get wet, you have

5    to allow a sufficient time to dry out or you have a

6    problem.

7              So the leakage mechanism that I'm going to talk

8    about on the next slides is two-fold.  One, the water

9    shedding surface has some significant discontinuities in

10   it at both masonry and siding, particularly at the

11   interfaces between the two, and that allows large

12   quantities of water to get behind the water shedding

13   surface.  So that's deficiency number one.

14             These large quantities flow between the

15   cladding and the water-resistive barrier.  And then

16   there's back lap joint, holes, and a number of other

17   deficiencies in the weather resistive barrier that will

18   allow that water to enter the interior of the building

19   and to deteriorate the moisture-sensitive parts of the

20   building.

21             So it's really a -- there's two holes, and if

22   you had sealed either one, there would have been a lot

23   less problems.  But the combination of the two is why

24   we're here.

25             So just as a matter of background -- this

Exhibit 37
Page 10 of 24

Testimony of Brian Hubbs                          June 13, 2006

Page 14

1    doesn't relate to MDF -- but these are sort of the

2    typical deficiencies that we're seeing in the water

3    shedding surface or the outer layer.

4           These are pictures here where we've done

5    interior and exterior openings in the same location.

6    And you can see here, this is a typical flashing at a

7    siding-to-brick interface.  And you can see there's

8    holes in the caulking here, and you can see it's back

9    sloped and there's just a mess of caulking around these

10   areas where water can get through it, contact that

11   weather-resistive barrier.  And you can see underneath

12   that location, taking it off, there's rust on the

13   flashing, showing that water is getting in underneath

14   the brick.  There's no end dam on this flashing, so

15   water can flow off of it, the end of it.

16        Q.   (By Ms. Hodgkinson)  What's an end dam?

17        A.   There's a slide in about three slides and I'll

18   show that in just a bit out of order.

19           Here's some discontinuities in the building

20   paper, but we're not talking about that now.

21           And then here's the deterioration of the

22   underlying sheathing, the sheathing board behind the

23   weather-resistive barrier, which is moisture sensitive.

24   So here water could get behind the flashing, because

25   it's not shingle lapped.  And here it can drop off the

83ac471e-78ee-42c4-971c-005057fe62dc

Exhibit __37__
Page __11__ of __29__

Testimony of Brian Hubbs                                        June 13, 2006

Page 18

1    surface was someone else's.

2           THE COURT:  Okay.

3       A.    So these are the typical WRB deficiencies that

4    we're seeing.  This is one at the brick veneer where we

5    have -- there's a combination -- I have a detail in a

6    second that will show this.  But there's a sill flashing

7    under the window and then there's a -- this is the WRB.

8    And that should be shingle lapped, like a shingle.  So

9    under the window, the flashing should be lapped over top

10   of that, so any water that gets in can drain out.

11           In this case, the WRB was installed and then

12   just taped to the frame of the window here.  But as you

13   can see, the tape actually isn't sealing it to the

14   window frame.  So really it's just laid up against the

15   window frame.  So any water that gets through that weep

16   hole or failed caulking just runs around the window

17   frame and goes right in behind the WRB.

18           THE COURT:  So that should be underneath the

19   window --

20           THE WITNESS:  Should be tucked underneath,

21   that's right.

22           THE COURT:  Got you, okay.

23       A.    This is an area where we did an exterior

24   opening and an interior opening.  It's just a typical --

25   it doesn't look too bad.  We opened it up --          Exhibit  37
                                                            Page 12 of 24

Testimony of Brian Hubbs                              June 13, 2006

Page 19

1        THE COURT:  My question is:  Wouldn't an

2    inspector on the job -- if an inspector is doing their

3    job, look at that and say -- I mean, it would be obvious

4    that that's not tucked up underneath the window.

5        THE WITNESS:  Yeah.  Well, this is the thing,

6    we looked back at the Marx/Okubo report, he identifies

7    that and those reports went to MDF.

8        THE COURT:  So at the time they were installing

9    the barrier there, they were informed that they were

10   being installed incorrectly then; is that what you're

11   saying?

12       THE WITNESS:  I'm not sure about the exact time

13   line, but certainly when I look back at Marx/Okubo's

14   reports, they're identified and they were distributed to

15   MDF.  So not only were they doing it wrong, but they

16   knew they were doing it wrong.

17       THE COURT:  Hum.

18   A.   These are typical deficiencies that we're

19   seeing at the WRB; these are just holes.  Behind those,

20   we're seeing fungal growth on the exterior sheathing.

21   Here we have just damage -- you have some building

22   paper.  With the building paper installed over top.  So

23   it was MDF's --

24       THE COURT:  Is that an MDF problem?

25       THE WITNESS:  Well, MDF was responsible to put

Exhibit  37
Page  13  of  24

Testimony of Brian Hubbs                          June 13, 2006

Page 20

1    this material on as well as the WRB.

2              THE COURT:  The (inaudible).

3              THE WITNESS:  Yeah.

4              THE COURT:  Okay.

5         A.   Here's another unit, 405, where we made an

6    interior and an exterior opening.  And here we're

7    finding, like, lack of building paper.  So this was

8    around a window frame, there's just a gap in the

9    building paper there where it didn't get put on.

10             Here's another gap here.

11             Here's a gap at the jam of the window.  There's

12   a seal between the building paper and the window flange,

13   and it's just a gap here.  And we follow this down to

14   the bottom, we're finding fungal growth right below

15   that.

16             Here we have a reverse lap, a back lap.  So

17   obviously when you want something waterproofed you

18   shingle lap it.  This is reversed, the wrong direction.

19   We saw that in a number of cases.

20             Here's where we've got a reverse lap and then

21   it kind of squishes over and does a shingle lap, but

22   it's only half an inch.  It's supposed to be at least 2

23   inches.

24        Q.   I'm sorry to interrupt.  What happens when the

25   reverse-lap situation occurs?

Exhibit 37
Page 14 of 24

Testimony of Brian Hubbs                                    June 13, 2006

Page 23

1    water gets behind it and goes straight in.  And you can

2    see damage at the base of that here.

3        Q.    (By Ms. Hodgkinson)  And again, that's an MDF

4    responsibility, that flashing?

5        A.    No.  The flashing I think was installed by --

6        Q.    The sider?

7        A.    The sider, I think.

8        Q.    But the WRB, the integration of the WRB was

9    MDF?

10       A.    Yeah, that's MDF's responsibility.  They need

11   to leave it loose --

12       Q.    Right.

13       A.    -- come back and tie it in.

14            This is our doors on to the balconies, and we

15   just took a little area over around here to see what

16   that looked like and we found fungal growth on the

17   interior.

18            This is an important one here.  MDF -- one of

19   MDF's responsibilities, under the Marx/Okubo direction

20   was to install a flashing, a waterproof flashing under

21   the windows.  Quite often, we'll find miter joints in

22   windows are a cause of deterioration in these kind of

23   cases.  And so nowadays, you install a waterproof

24   membrane under your window.  So if your window leaks, it

25   catches it and it kicks it out to the outside.  So that

Reed Jackson Watkins        Court-Certified Legal Transcription    206.235.3281/206.795.4421

83ac471e-78ee-42c4-971c-005057fe62dc

Exhibit  37

Page  15 of 24

Page 24

1   was one of the responsibilities.

2           .   And here's one opening that we did where

3   they've installed it and then it's just not here from

4   here to here, which is just a really, really poor job of

5   making sure that was continuous.  And underneath there,

6   we see signs that water has been getting in there.  Not

7   a lot of damage on that one.

8           And here's just a shot here from the exterior

9   of that same situation.  We have our weather-resistive

10  barrier here on Building 18, it comes up and there's the

11  tape that's supposed to tape that to the window flange.

12  They intended that to be a water-tight seal, but you can

13  see at the top of the tape there's a green.  So the

14  tape's not actually sticking to the window flange, it's

15  just sticking to the WRB.  So there's no seal there.

16  Any water that leaks out -- this weep hole that tucks in

17  back here, it just goes right in behind.

18          And you can see here, this is water here that's

19  trapped between the sub sill membrane, which was

20  installed in this case, and the WRB.  So that's water

21  trapped in there.

22          And here's water wetting -- this is soaking wet

23  Gypsum board here.  And you can see the end of this

24  flashing is about here.  So that water that's stuck here

25  is going down, wetting the Gypsum board and it's raising

1  anything -- so that any rain would just be deflected off

2  here and this sealing joint would last quite a long

3  time.

4            THE COURT:  That's a siding problem, right?

5            THE WITNESS:  Yeah.

6            THE COURT:  That's a siding issue.  Okay.

7       A.  But then anything that did leak would leak down

8  here a shingle lap over this and drain out harmlessly

9  out the bottom.

10            So to summarize everything:  From a masonry and

11 siding point of view, there were deficiencies.  And we

12 don't need to go through those again.  And then from a

13 weather-resistive barrier standpoint, which is MDF, the

14 WRB was not installed in accordance with the

15 construction documents, industry practice or the

16 building code as follows.  It -- it had back lap joints,

17 physical damage and inadequate seals and it wasn't

18 installed in some areas.  As a result, both water which

19 penetrated behind the water shedding surfaces, such as

20 the masonry walls, lap siding and windows, was able to

21 come into direct contact with the moisture-sensitive

22 sheathing and result in a significant and systemic

23 levels of decay in the building.

24      Q.  Are you done with your explanation, Mr. Hubbs,

25 of the damage you observed and how it worked?

Exhibit 37
Page 17 of 24

Testimony of Brian Hubbs                        June 13, 2006

Page 32

1    A.    Yes.

2    Q.    Okay.  As part of your review for the

3  defendants in this matter, did I ask you to review the

4  repair bid of RH Construction, which was repaired at the

5  request of the defendants, to make a determination as to

6  what the responsibility of MDF was -- percentage

7  responsibility of the overall repair costs?

8    A.    Yes, you did.

9    Q.    Okay.  And before we get to that subject.

10 Based on your investigation and all the things that

11 you've done, the building investigation, the contract

12 documents review, do you have an opinion as to whether

13 MDF did not meet the required standards of the then

14 applicable building code?

15   A.    They did not.

16   Q.    Okay.  And you just described that in your --

17 nor did they perform to industry standards at the time;

18 is that correct?

19   A.    That's correct.

20   Q.    And they did not provide a weather-resistive

21 barrier to keep out moisture that came through the

22 building envelope, correct?

23   A.    Correct.

24   Q.    All right.  Go ahead.  On to your analysis and

25 evaluation.  I know that you did a number of

Exhibit  37
Page 18 of 27

Testimony of Brian Hubbs                              June 13, 2006

Page 33

1    calculations based upon the R&H bid and their line items

2    for repairs.  And if you could explain to the Court

3    exactly what -- how you arrived at that figure that you

4    arrived at and what that is?

5        A.    Sure.  What I did here is I broke down R&H's

6    bid here.  These are the basic categories.  I combined

7    some categories together, but these are the basic

8    categories and line items from their bid dated 7

9    February '06.

10            THE COURT:  So they came in to give an estimate

11    on the costs of repairing, not only the

12    weather-resistant barriers issues of MDF, but the whole

13    project?

14            MS. HODGKINSON:  The whole building complex,

15    correct.

16            THE COURT:  Okay.

17        Q.    (By Ms. Hodgkinson)  And the bid is separated

18    into line items so you can see which trade is

19    responsible for what repair.

20        A.    That's right.  So what I ended up doing here,

21    just trying to be fair to everybody, was to apportion it

22    out in basic rough accordance with the failure

23    mechanism.  So if there was two items that resulted in a

24    failure, I split it 50/50; if there was three, I divided

25    it three ways; if there was one that I thought was a lot

Testimony of Brian Hubbs                          June 13, 2006

Page 34

1    less then the other, but both were required, I divvied

2    it that way.

3            So this is how I broke it down.  What I did,

4    too, is I also left -- basically everything in yellow

5    here is a specific item to repair a specific deficiency.

6    These are the soft costs, the general conditions, and

7    the insurance and everything else; and I left those out

8    to the end and then I divided those up by the

9    responsibility overall of the hard items.  So it will

10   make sense once I go through it.

11           So when we talk about demolition of masonry and

12   siding, that's taking off the masonry and the siding.  I

13   took 50 percent mason and 50 percent framing --

14       Q.    Why?

15       A.    -- and WRB.

16           Just because you needed both people to have

17   that problem.  The mason wasn't solely responsible and

18   neither was the WRB and framing guy.

19           When they talked about the putting back on the

20   new masonry, this is the new --

21           THE COURT:  Let me -- MDF was WRB and framing?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.

24       A.    And you know what, there was a couple of other

25   contractors that did WRB and framing, and I kind of sort

Testimony of Brian Hubbs                              June 13, 2006

Page 35

1    that out at the very end.

2          So when it came down to whether or not -- when

3    we're installing new weather-resistive barrier, I put

4    100 percent of that to the guy that should have

5    installed it right in the first place.  But when it came

6    down to putting new brick and new siding on and new

7    accessories, I put it 50/50.  Because that brick and

8    siding needed to come off and put back on for two

9    reasons:  One to fix the WRB, and one to fix the overall

10   water-shedding surface deficiencies.

11        Q.    (By Ms. Hodgkinson)  So that needs to come off

12   to fix the WRB anyway?

13        A.    That's right.

14              So I portion those all 50/50 from a siding

15   standpoint.

16              We get down to the roofing, new roofs on all

17   buildings.  Primarily the roofing issues were roofing

18   related.  However, the framer -- and the guy that did

19   WRB and the framer put on the sheathing membrane around

20   the roof and also put the sheathing on the roof, and

21   there were some holes and discontinuities in that, and

22   there was some warping that was claimed by the roofer.

23   So we put some responsibility there, but it wasn't the

24   majority.  So I came up with 15 percent.

25              Walls, the sill pans, the flashing, and the new

83ac471e-78ee-42c4-971c-005057fe62dc

Exhibit __37__
Page _21_ of _24_

Testimony of Brian Hubbs                              June 13, 2006

1    caulking, I divided it up between the sider and the WRB

2    installer, 50/50 for the same reason.

3        Q.    You can use MDF because it's MDF we're talking

4    about here today.

5        A.    MDF, okay.

6              Doors and windows.  New windows, we had a

7    contingency in there to replace 25 percent of the

8    windows because we knew some would be leaking.  I put

9    that 100 percent on the window trade.  But in terms of

10   reinstalling the windows, taking them out and putting

11   them back, I split that out 50/50 because they needed to

12   come out because the windows were bad, but they also

13   needed to come out to fix the WRB.

14             And then finishes, new exterior sheathing, and

15   exterior painting, 50/50 with the sider for the same

16   reasons.

17             Now what I did is I took those and I calculated

18   it out how much those were based on those last

19   percentages and then I just divided -- I added up the

20   costs and divided by the 7 million to get everybody's

21   proportional responsibility for the general conditions

22   items.  So just the WRB trade had 43 percent of the

23   overall issues, so he took 43 percent of the close out,

24   electrical allowance, insurance, and general conditions.

25   And that's how I calculated out the responsibility for

Exhibit    37
Page 22 of 24

83ac471e-78ee-42c4-971c-005057fe62dc

Testimony of Brian Hubbs                          June 13, 2006

Page 37

1    the trades for the non-hard cost items.

2        Q.    Did the general conditions include things like

3    scaffolding, mobilization, all the things that have --

4        A.    Yeah.

5        Q.    -- all the work?

6        A.    And you can't really say, you know, this is

7    directly -- directly attributable to one trade.

8        Q.    When you're doing this type of line item

9    extrapolation, it's common to attribute a percentage of

10   that general conditions to a particular trade in

11   accordance with their responsibility?

12       A.    Yeah.  I think it's the fairest way to do it

13   because you have -- you know, the person that's doing

14   the most work, needs the most scaffolding and needs the

15   most site coordination and insurance.  So typically, you

16   can break it down that way.

17            And then what I did is I broke down the total

18   number here, which I associated with WRB of $3 million,

19   give or take, to the different trades.  So there were

20   three trades that did WRB work:  Big Dog, Bellinger, and

21   MDF.  MDF did 10 of the 21 buildings, and I just broke

22   that down.  I took 48 percent of the 3 million and came

23   up with a number for MDF.  And that's based on the R&H

24   estimate of $7 million.

            Exhibit 37
            23 of 24

25            Now, we settled for 5 million.  So what we

Reed Jackson Watkins        Court-Certified Legal Transcription   206.235.3281/206.795.4421

83ac471e-78ee-42c4-971c-005057fe62dc

Testimony of Brian Hubbs                    June 13, 2006

Page 38

1    decided to do is to take this number because that's

2    proportionately right and just prorate it for 5 million.

3    So we took 71 percent, 5 million over 7 million, of that

4    number and came up with $1,025,000 to arrive at that

5    number.

6        Q.   So this was your mathematical calculation to

7    arrive at the figure that fairly represents the amount

8    of money paid in settlement versus the repair bid?

9        A.   That's right.

10        Q.   And the calculation reflects that MDF's portion

11    for the work that it physically did on the buildings for

12    the WRB that's its proportionate share, and that's the

13    amount that what you calculated under 5 million that's

14    the ultimate number that they would be responsible for?

15        A.   That's correct.

16        Q.   Okay.

17              (Conclusion of testimony.)

18

19

20

21

22

23

24                                    Exhibit _37_

25                                    Page _24_ of _24_